UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| CHRISTINE SAMUEL, AS NATURAL PARENT AND GUARDIAN OF CSD, ) ) | Civil Action No.: 4:12-cv-2277-TLW-TER |
| Plaintiff, ) | |
| -vs- ) | |
|  ) | **REPORT AND RECOMMENDATION** |
| JAMES H. DICKEY and JAMES H. DICKEY LAW FIRM, ) ) | |
| Defendants. ) | |

## I.     INTRODUCTION

Plaintiff Christine Samuel filed this legal malpractice and breach of fiduciary duty action in this court on August 9, 2012, alleging jurisdiction under 28 U.S.C. § 1332.[1]  In December of 2012, Samuel requested and was granted an extension of time to perfect service on Defendants.  In January, Samuel was granted leave to serve Defendants by publication.  Defendants have not made an appearance in this action and the clerk of court made an entry of default as to both Defendants on September 30, 2013.  See  Clerk's Entry of Default (Docket Entry # 15).  Presently before the court is Samuel's Motion for Default Judgment (Docket Entry # 16).  This motion was referred to the undersigned pursuant to 28 U.S.C. § 636.  This report and recommendation is entered for review by the district judge.

---

[1] Plaintiff is a citizen of South Carolina.  As set forth below, Defendant Dickey held himself out to be a citizen of Georgia and Plaintiff has been unable to find any indication that Dickey lived in South Carolina at the time this action was filed.  In addition, the James H. Dickey Law Firm was located in Atlanta, Georgia at the time this action was filed.  Thus, Plaintiff has met her burden of establishing by a preponderance of the evidence that Dickey is a citizen or resident of a state other than South Carolina and the James H. Dickey Law Firm is a Georgia entity.

## II.     PROCEDURAL HISTORY

As stated above, Samuel moved to serve Defendants by publication. Prior to filing the motion, counsel for Samuel and his staff attempted to locate Defendant James H. Dickey in South Carolina, but were unable to find him or any owner-occupied residential property in South Carolina. Second Jophlin Aff. ¶ 4 (Docket Entry # 29). However, through his investigation, counsel discovered that Dickey was the owner of record of approximately six parcels of land in Darlington County, although the tax assessor's office does not show any of these parcels as "owner occupied."[2] Second Jophlin Aff. ¶ 6 and Ex. A. Dickey has paid property taxes on the parcel located at H St. & Society Ave. Lots 5 & 6 (parcel number 055-07-03-058) at recently as December 1, 2014. Second Jophlin Aff. ¶ 8 and Ex. B.

Further, counsel was aware that Dickey held himself out as a resident of Georgia. Revised Jophlin Aff. ¶ 6 (Docket Entry # 28). The retainer agreement signed by Samuel in the underlying medical malpractice and documents submitted to the Darlington County Clerk of Court in 2000 indicate Dickey's firm was located in Atlanta, Georgia at that time. Second Jophlin Aff. ¶ 9 and Ex. C.

In preparation to serve Defendants, counsel for Plaintiff searched the South Carolina Bar Organization's Member Directory for a current address for Dickey, and the address listed was for an office in Atlanta, Georgia. Revised Jophlin Aff. ¶ 5. Counsel also spoke to members of South Carolina's Office of Disciplinary Counsel and the South Carolina Department of Public Safety's Office of General Counsel, who verified that they were unaware of any permanent residential address

---

[2]One of the properties located at 216 S. 6th Street, Hartsville, South Carolina, is residential and contains a house on the property. However, Samuel verified at the time of filing and attempted service, and again recently, that the house is vacant, dilapidated, and not suitable for habitation. Second Jophlin Aff. ¶ 6, n.1.

for Dickey within the state of South Carolina, and directed counsel to responses Dickey made to their office containing an Atlanta, Georgia address. Jophlin Aff. ¶ 5 and Ex. D. Counsel then checked the Georgia State Bar website, which listed an address for Dickey of 1745 Martin Luther King, Jr. Dr., NW, P.O. Box 2405, Atlanta, Georgia 30301. Jophlin Aff. ¶ 5 and Ex. D.

Upon locating the Atlanta, Georgia address, counsel hired Atlanta Legal Services, Inc. in September of 2012 to personally serve Dickey. Atlanta Legal Services made seven unsuccessful attempts to personally serve James H. Dickey at his last known address of 1745 Martin Luther King Jr. Drive, Atlanta, Georgia. Affidavit of Due Diligence (Ex. A to Pl. Motion for Service by Publication). In October of 2012, counsel for Plaintiff hired Tammie Gruhn who is a process server located in Atlanta to serve the Defendant with the Summons and Complaint in this matter. After numerous attempts, telephone calls and research, Ms. Gruhn was also unable to serve Defendant James H. Dickey. Gruhn Affidavit of Due Diligence (Ex. B to Pl. Motion for Service by Publication).

Thereafter, Samuel moved to serve Defendants by publication in Atlanta, Georgia, and the motion was granted, allowing Samuel to serve Defendants by publication in accordance with federal and state law.[3] See Order dated January 18, 2013 (Docket Entry # 12). The order directed Samuel to insert "a copy of the Summons and Notice of the location and date of filing of the Summons and Complaint [ ] into the Atlanta Journal-Constitution or other newspaper of the Atlanta, Georgia area

---

[3] Federal Rule of Civil Procedure 4(e)(1) provides that an individual may be served by "following the state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." South Carolina law allows service by publication when a nonresident, upon whom service cannot be made, has property in this state and the court has jurisdiction over the matter. S.C. Code Ann. § 15-9-710(4). As set forth above, Dickey is a non-resident of South Carolina who owns property in this state. Further, this court has jurisdiction over this matter.

-3-

at a frequency of not less than one (1) publication per week for a period of three (3) consecutive weeks."[4]  Order dated January 18, 2013.  In February of 2013, Samuel served Defendants by publication in the Daily Report[5] in Atlanta, Georgia for three consecutive weeks.  Affidavit of Service by Publication (Docket Entry # 13).  Defendants have not answered Samuel's complaint or otherwise made an appearance in this action.  Samuel requested a clerk's entry of default, which was entered on September 30, 2013.

## III.     FACTS

The allegations in Samuel's complaint are accepted as true in light of Defendant's default. See DIRECTV, Inc. v. Rawlins, 523 F.3d 318, 322 n.1 (4th Cir. 2009) (accepting plaintiff's allegations against defaulting defendant as true, noting a defaulting defendant "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established") (quoting Ryan v. Homecomings Fin. Network, 253 F.3D 778, 780 (4th Cir. 2001)).  In 1999, Christine Samuel, on behalf of her daughter CSD, retained the James H. Dickey Law Firm, and James H. Dickey to pursue a claim arising out of medical malpractice against Harvey N. Brown, M.D., and Professional Obstetrics and Gynecology, P.A.

On February 5, 1997, Christine Samuel gave birth to CSD. Harvey Brown, M.D. was the delivering physician and was noted to have used "vacuum extraction assistance" during the delivery because Christina was taking too long with the delivery. Dr. Brown used the vacuum even though CSD was not in the birth canal. The vacuum was attached to the head and CSD was pulled out.

---

[4] S.C. Code Ann. § 15-9-740 provides for such service.

[5] The Daily Report is the "legal organ" for Fulton County, Georgia.  Jophlin Aff. ¶ 7 and Ex. F.  A legal organ is the paper in which sheriff's advertisements are printed.  See O.G.C.A. § 9-13-140; O.G.C.A. § 9-11-4.

Within seven days of birth, CSD experienced her first seizure episode and was transported to Carolinas Hospital System in Florence, South Carolina. CSD was transferred to Medical University of South Carolina, where her seizure activity was observed and treated. An MRI revealed a subdural hemorrhage, predominantly in the right occipital region. She was prescribed phenobarbital and received a diagnosis of myoclonus.

CSD was treated by specialists over the next several months for recurring neonatal seizure episodes. By two years of age, CSD was still experiencing, on average, two seizures per month. Over the next several years, CSD continued to suffer from the seizure disorder. She continues to suffer seizures, concentration and learning issues, headaches, and dizziness.

Christina Samuel first consulted with Dickey in March 1997 regarding the medical care and treatment she and her daughter received from Dr. Brown. During these initial discussions, Christina Samuel was only aware of Dickey's Hartsville office; she was not made aware of his Atlanta office. Christina Samuel retained Dickey and the James H. Dickey Law Firm to represent CSD in an action against Dr. Brown and his practice, Carolinas Obstetrics and Gynecology, P.A. They would most often speak over the phone, and occasionally meet in person at either his Hartsville office or in her home. On February 4, 2000, Dickey filed a lawsuit alleging medical negligence and breach of professional obligation in a medical malpractice action, against Dr. Harvey M. Brown, M.D. and Carolinas Obstetrics and Gynecology, P.A. Attorneys for Dr. Brown and his practice filed an answer and motion to dismiss on March 22, 2000, denying the allegations of malpractice.

A hearing was originally set on the motion to dismiss for April 18, 2000, but it was rescheduled for May 2, 2000, by consent of both parties (per the court's order). On May 1, 2000, the day before the scheduled hearing, Dickey sent a letter to the clerk of court requesting a continuance based on the fact that he was second on the trial roster in Spartanburg County and he had to appear

for the call of the case on May 2, 2000. The hearing was continued by order of Judge Cottingham; attorneys for Dr. Brown forwarded a proposed order to the clerk of court to set the motion hearing for a date certain on June 1, 2000. Dickey filed a return objecting to the hearing being scheduled "outside the normal court schedule," and requested that the motion be placed on the regular motions calendar.

A hearing on the motion was again re-scheduled to be heard by Judge Pieper on May 30, 2000. Dickey was personally given notice of the new date and time, and he indicated to the court's administrative assistant that he would be at the hearing. Instead of attending, however, Dickey sent a facsimile requesting that the hearing be moved to a different date. The presiding judge directed that the motion be re-scheduled at the first available term and indicated that, "because of his failure to appear," Dickey was to be put "on notice that a subsequent failure to appear without prior approval by the court may result in any sanctions the presiding judge may deem appropriate; the sending of a fax without the court's subsequent approval is insufficient to excuse any failure to appear."

Meanwhile, Dickey failed to respond to discovery requests which were served on April 3, 2000. Attorneys for Dr. Brown attempted to contact Dickey by phone and letter, and ultimately filed a motion to compel on May 19, 2000.

The motion to dismiss and the motion to compel were heard on July 13, 2000, by Judge Lockemy. The motion to dismiss the Doe defendants was granted; the motion to compel was granted and Dickey was ordered to respond to discovery requests within 45 days. The court directed Dr. Brown's attorney to prepare an order, which was done and forwarded to Dickey for review. Dickey objected to the delay in preparation and asserted that the proposed order was inconsistent with the court's bench ruling. Attorneys for Dr. Brown acknowledged that the proposed order was inaccurate

in allowing 60 days to answer the discovery, and forwarded a revised order to the court which correctly recited that Dickey had 45 days from the hearing date to respond to discovery requests. Dickey never answered the discovery requests.

At the request of the court, attorneys for Dr. Brown contacted Dickey on November 1, 2000, to set up a conference call regarding the discovery issues. When Dickey again failed to respond, attorneys for Dr. Brown filed a motion to dismiss on the grounds that Christina Samuel had unreasonably failed to prosecute the action.

On December 15, 2000, the court signed the corrected order and forwarded it to counsel for both parties. In its cover letter, the court noted, "this matter could have been concluded long ago if Mr. Dickey had contacted my office as requested." With its order on the motions, the court also forwarded a separate order "detailing the efforts of [his] office to get both parties together to reconcile their difference." In its order, the court recounted the numerous times that his law clerk had attempted to contact Dickey. While the law clerk was unable to reach Dickey personally, he left numerous messages on his voice mail and other times he was unable to leave messages because the voice mailbox was full. Dickey never contacted the Judge's office; the order was signed.

On December 18, 2000, attorneys for Dr. Brown served a motion for summary judgment based on the fact that Christina Samuel had failed to produce an expert witness to testify as to the proper standard of care or of Dr. Brown's deviation therefrom. The motion for summary judgment was scheduled to be heard on March 12, 2000. When the matter was called for hearing before Judge Floyd on that date, Dickey failed to appear. The clerk told Judge Floyd that Dickey called the previous week and said he was sick, and sent a letter dated March 9, 2000, to the clerk of court requesting a continuance through March 15th based on "acute illness." Judge Floyd refused to continue the case and granted summary judgment based on the absence of any expert evidence on

the standard of care or any deviation, and he also dismissed the action with prejudice based on Dickey's failure to prosecute.

Dickey filed a motion for reconsideration on April 10, 2001. A hearing on the motion was scheduled for June 27, 2001. The clerk of court mailed notice of the hearing to Dickey, faxed him a copy of the notice, and left a message on his voicemail. However, Dickey did not request a continuance or notify the court that he would not attend – he simply did not show up. Judge Floyd denied Dickey's motion to reconsider based on counsel's failure to appear and also on the merits.

Dickey filed a notice of appeal, arguing abuse of discretion by the trial judge in granting summary judgment, in dismissing for failure to prosecute, in failing to grant a continuance due to Dickey's sickness, and for failure to conduct a hearing on the records for Dr. Brown's various motions. He ultimately filed a petition for writ of certiorari with the Supreme Court of South Carolina, which was denied.

Dickey failed to make Christina Samuel aware of any of the events that had happened up to this point. When Samuel would contact Dickey, he would tell her that the case was still active and he was appealing an issue with the case. Samuel then stopped hearing from Dickey altogether, but was under the impression that her case was still active.

An investigation into Dickey's law practice was undertaken by the Office of Disciplinary Counsel in 2009. During the disciplinary hearing, Samuel testified that she was informed of the appeal, and that she first learned the true status of her case two weeks prior to her testimony on March 22, 2010.  The South Carolina Supreme Court issued a Definite Suspension of Dickey on November 21, 2011 (Op. No. 27066). In their decision, the Court found Samuel's matter was proven by "clear and convincing evidence." The Court further stated, "[Dickey] never informed Samuel of the reason for the dismissal, but only communicated that the case was on appeal.  [Dickey] also

failed to maintain contact with Samuel and never informed her that the Court of Appeals had affirmed the circuit court's order, this Court had denied the petition for a writ of certiorari, or that he had been placed on Interim Suspension."

Samuel attached to her complaint the affidavit of Charles Hodge, Esq., an attorney in Spartanburg, South Carolina who routinely litigates medical malpractice claims on behalf of injured clients. Hodge Aff. ¶¶ 1-2. Hodge opined to a reasonable degree of legal certainty that Dickey was negligent and grossly negligent in failing to comply with the appropriate standard of care by his

  (a)   Failure to appear at scheduled court hearings;
  (b)   Requesting a continuance in violation of a court order;
  (c)   Failure to answer discovery requests;
  (d)   Failure to notify his client that her action was dismissed and [the] reason for dismissal;
  (e)   Failure to notify his client of appellate decision affirming the lower court;
  (f)   Failure to keep proper communication with [his] client during [the] proceeding;
  (g)   Failure to inform his client of his interim suspension; [and]
  (h)   Dishonesty and/or misrepresentation with the lower court.

Hodge Aff. ¶ 7.

A damages hearing was held on February 10, 2015, during which Christina Samuels[6] testified and presented additional evidence. Samuel testified that her labor with CSD was induced, but the birth was not progressing quickly enough for Dr. Brown so he used the vacuum to pull CSD out of the birth canal. When CSD was seven days old, she began jerking movements, her eyes rolled back in her head and, at times, stopped breathing. She called for an ambulance, and when they arrived they informed her that CSD was having seizures. CSD was transported to a hospital in Florence, South Carolina, and then transferred to the Medical University of South Carolina (MUSC) in

---

[6]Plaintiff Christina Samuel filed this action on behalf of her daughter, who was a minor at the time this action was filed. The daughter has since reached the age of majority, but agreed at the hearing to allow her mother to proceed on her behalf.

Charleston, South Carolina because she was having four or five seizures per day. Doctors at MUSC explained that the seizures were caused by a blood clot, which was caused by a suction pump used during birth. Medical records reveal that CSD suffered "bilateral occipital subdurals probably caused by vacuum suctioning during birth." Electroencephalography Report (Pl. Ex. 6 in Damages Hearing). Doctors at MUSC prescribed CSD phenobarbital, and she remained at MUSC for a couple of weeks until the phenobarbital was able to stabilize the seizures to one or two a day rather than four or five a day. Samuel testified that the frequency of the seizures diminished once CSD reached the age of nine or ten, but they never stopped completely. After age nine or ten through age sixteen, CSD experienced seizures once every few months.

Samuel testified that CSD continued to receive treatment from pediatricians and neurologists at MUSC until CSD was no longer eligible for Medicaid, around the age of nine or ten. At that time, Samuel was no longer able to afford the medical care CSD needed. She would take CSD to the emergency room when she had a seizure.

Samuel testified that CSD has had trouble in school and failed twice. She also testified that CSD wanted to play basketball but she was not able to do so or participate in other sports because when she gets overheated by being active, she has a seizure. Although CSD has not had a seizure in approximately two years (since the age of sixteen), the threat of seizures will always be present. CSD's seizures can be triggered by a fever, becoming overheated, becoming upset, or being too tired.

Samuel also presents the affidavit of Lisa Maselli, M.D., a physician licensed in South Carolina and Board Certified by the Board of Obstetrics/Gynecology. Maselli Aff. ¶¶ 1-2. She opines to a reasonable degree of medical certainty that Dr. Brown was negligent, grossly negligent, and reckless in failing to comply with the appropriate standard of care by (a) failing to properly document his role in the labor and delivery of CSD, including length of delivery, length of time the

vacuum was used, the number of times the vacuum was used, or the baby's station (or location) at the time of vacuum use; (b) growing impatient with the length of time Samuel was in labor and, without proper care and attention in its use, utilized a Mity vacuum while the newborn was far inside the birthing canal; (c) failing to make a meaningful evaluation of Samuel or CSD, and observe the "cherry mark" that was left on the back of CSD's cranium or any other injury or adverse effect that may have been caused by the use of the Mity vacuum; and (d) failing to properly care for and treat his patients. Maselli Aff. ¶ 7. Dr. Maselli also opines that Dr. Brown's violations of the standard of care proximately caused the injuries suffered by CSD, which she identifies as seizures due to a subdural hemmorage predominantly in the right occipital region. Maselli Aff. ¶ 8.

**V.     DISCUSSION**

Samuel asserts causes of action against Defendants for legal malpractice and breach of fiduciary duty. The facts presented in this case are sufficient to establish liability under either theory. To prove a claim for legal malpractice, a plaintiff must show (1) the existence of an attorney-client relationship; (2) a breach of duty by the attorney; (3) damage to the client; and (4) the damage was proximately caused by the breach of duty. Holy Loch Distributors, Inc. v. Hitchcock, 340 S.C. 20, 26, 531 S.E.2d 282, 285 (2000). In 1999, Samuel, on behalf of CSD, retained the James H. Dickey Law Firm, and James H. Dickey to pursue a claim arising out of medical malpractice against Harvey N. Brown, M.D., and Professional Obstetrics and Gynecology, P.A., thus, an attorney-client relationship existed. Further, Samuel's expert, Charles Hodge, Esq., opines that Defendants breached the standard of care for attorneys and, thus, breached his duty to Samuel. With respect to the last two elements, Samuel must prove that she most probably would have been successful in the action if the attorney had not committed the alleged malpractice. Brown v. Theos, 345 S.C. 626, 629, 550 S.E.2d 304, 306 (2001). "Given the burden of the plaintiff in a legal malpractice action to prove

the probability of success of the underlying claim, the requisite analysis of the underlying claim that accompanies this burden requires, in essence, a trial within a trial." Eadie v. Krause 381 S.C. 55, 62-63, 671 S.E.2d 389, 392 - 393 (S.C.App.,2008) (citing Shearon v. Seaman, 198 S.W.3d 209, 210 (Tenn.Ct.App.2005)). Thus, Samuel must present sufficient evidence to establish that she most probably would have been successful on her medical malpractice claim if Dickey had not breached his duty of the standard of care.

To recover for medical malpractice, a plaintiff must illustrate the physician failed to exercise the degree of care and skill which is ordinarily employed by the profession under similar conditions and like circumstances. Jernigan v. King, 312 S.C. 331, 333, 440 S.E.2d 379, 381 (Ct.App.1993). This must be established by expert testimony unless the subject matter is of common knowledge or experience. Bramlette v. Charter-Med.-Columbia, 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990). As set forth above, Samuel presents the affidavit of Dr. Maselli, who opines that Dr. Brown violated the appropriate standard of care, which proximately caused the injuries and damages to CSD.

Samuel seeks damages in the amount she most probably would have received in the medical malpractice action but for Dickey's legal malpractice. She seeks compensatory damages for CSD's pain and suffering resulting from the seizures caused by Dr. Brown's medical malpractice. It is well established that the relief granted in a default judgment is limited to that supported by the allegations in the Complaint and the proof submitted at the damages hearing. Jackson v. Midlands Human Res. Ctr., 296 S.C. 526, 529, 374 S.E.2d 505, 506 (Ct.App.1988) ("In a default case, the plaintiff must prove by competent evidence the amount of his damages, and such proof must be by a preponderance of the evidence. Although the defendant is in default as to liability, the award of damages must be in keeping not only with the allegations of the complaint and the prayer for relief, but also with the proof that has been submitted. A judgment for money damages must be warranted by the proof of

the party in whose favor it is rendered." (citations omitted)). The evidence reveals that CSD suffered seizures four to five times a day for approximately two weeks, one to two a day for approximately nine or ten years, and one every few months for approximately six years. She has also suffered the loss of enjoyment of life by having to refrain from activities (such as basketball and other sports) and will continue to suffer with the threat of seizures. It is difficult to place a dollar figure on the pain and suffering and the loss of enjoyment of life of a child who has had to endure seizures throughout her childhood and who was not able to fully participate in sporting activities. Nonetheless, it is recommended that Samuel be awarded actual damages in the amount of three-hundred and fifty thousand dollars ($350,000).[7]

Samuel also seeks punitive damages against Defendants for their grossly negligent actions in the litigation of her medical malpractice case. The Supreme Court has made clear that "there are no rigid benchmarks that a punitive damages award may not surpass," so long as "the measurement of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and the general damages recovered." State Farm v. Campbell, 538 U.S. 408, 425-26, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In addition, "[a]lthough the Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award,' and has consistently declined to adopt a bright line ratio or simple mathematical test, the Court has remarked that 'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'"

Mitchell, Jr. v. Fortis Ins. Co., 385 S.C. 570, 588, 686 S.E.2d 176, 185 (2009) (citing Campbell, 538 U.S. at 425). Considering the factors set forth in Gamble v. Stevenson, 305 S.C.

---

[7]The court has considered the number of days and the number of seizures (in excess of 3,500) CSD has endured during her eighteen years in arriving at this figure.

104, 406 S.E.2d 350 (1991)[8], including Dickey's high level of culpability for failing to litigate the medical malpractice action, the length of time Dickey allowed Samuel to believe her case was still pending, Dickey's concealment of the status of Samuel's case, the existence of similar past conduct, as set forth in the South Carolina Supreme Court's opinion suspending Dickey's license to practice law, and that an award of punitive damages is reasonably related to the harm suffered by Dickey's conduct, the undersigned recommends a judgment of punitive damages in the amount of seven-hundred thousand dollars ($700,000).

Based upon the above, the undersigned finds that Samuel has established her claim for actual damages in the amount of $350,000 by a preponderance of the evidence and has established her claim for punitive damages in the amount of $700,000 by clear and convincing evidence.

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Samuel's Motion for Default Judgment (Docket Entry # 16) be granted and that judgment be entered against Defendants in the amount of one million, fifty-thousand dollars ($1,050,000).

> s/Thomas E. Rogers, III
> Thomas E. Rogers, III
> United States Magistrate Judge

February 26, 2015
Florence, South Carolina

**The parties are directed to the important notice on the following page.**

---

[8] In Gamble, the South Carolina Supreme Court identified eight considerations that trial courts should apply in conducting a post-judgment due process review of any punitive damages award. Although the present posture of this case does not involve a post-judgment due process review, the Gamble considerations are instructive: (1) the defendant's degree of culpability; (2) the duration of the conduct; (3) the defendant's awareness or concealment; (4) the existence of similar past conduct; (5) the likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) the defendant's ability to pay; and (8) any other factors deemed appropriate. Gamble, 305 S.C. at 111–12, 406 S.E.2d at 354.